IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT
EASTERN DIVISION

RONNY CARSON AND BIANCA MURRAY,

    Plaintiffs,

v.

JOSEPH VECCHIO, RICHARD RODRIQUEZ, JR., MARIO FUENTES, NICU TOHATAN, AND CITY OF CHICAGO,

    Defendants.

Case No. 25-cv-13444

*Jury Trial Demanded.*

# COMPLAINT

NOW COME Plaintiffs RONNY CARSON and BIANCA MURRAY, by their attorney, LAW OFFICE OF JORDAN MARSH LLC, and complaining of the Defendants, JOSEPH VECCHIO, RICHARD RODRIQUEZ, JR., MARIO FUENTES, NICU TOHATAN, and CITY OF CHICAGO, and state the following:

**JURISDICTION AND VENUE**

1. This action arises under the Constitution of the United States, particularly the Fourth Amendment to the Constitution of the United States, under the laws of the United States, particularly the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 1988, and under the laws of the State of Illinois.

2. The jurisdiction of this Court is invoked under the provisions of Title 28 of the United States Code, 1331 and 1343. Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to Title 28 of the United States Code, Section 1367.

3. This Court has jurisdiction over this action pursuant to Title 28 of the United States Code §§ 1331 and 1367, as Plaintiff asserts claims under federal law and the state law claims arise out of the same facts as the Federal claims. Venue is proper under Title 28 of the United States Code, § 1391(b)(2), as the events complained of occurred within this district.

## PARTIES

4. At all times relevant herein, Plaintiffs RONNY CARSON ("Ronny") and BIANCA MURRAY ("Bianca") were residents of the County of Cook, State of Illinois.

5. Defendants VECCHIO, RODRIQUEZ, FUENTES, and TOHATAN, ("Defendant Officers") are sued in their individual capacities and were at all times relevant, sworn tactical police officers employed by Defendant CITY OF CHICAGO, and were acting within the scope of their agency, service and/or employment with the CITY OF CHICAGO, and were acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Illinois.

6. Defendant, CITY OF CHICAGO, is a government entity operating within the State of Illinois. The CITY OF CHICAGO is responsible for the actions of its employees while acting within the scope of their employment. At all times relevant to this action, CITY OF CHICAGO was the employer of Defendants VECCHIO, RODRIQUEZ, FUENTES, and TOHATAN.

## FACTUAL ALLEGATIONS

7. On June 14, 2024, at approximately 5:09 p.m., Ronny was seated in the driver's seat of his vehicle at or near 129 E. Superior Street in Chicago, waiting for his wife, Bianca, who was in a nearby store, when Defendant Officers approached the vehicle.

8. Defendant Vecchio approached the passenger side of the vehicle and stated that the vehicle was parked in a tow zone. Vecchio then asked if Ronny was waiting for someone, instructed him to roll down his window, requested his driver's license, and stated that they would probably just give him a warning.

9. Ronny complied with Vecchio's orders.

10. Vecchio asked if there were any firearms in the vehicle. Ronny responded that there were not.

11. Vecchio handed Defendant Tohatan Ronny's driver's license.

12. Defendant Rodriquez asked Ronny whether he had a concealed carry license and whether there were any weapons in the vehicle. Ronny again denied that there were any weapons. Defendant Rodriguez then asked Ronny to lower the rear windows and made a comment about the window tint.

13. Rodriquez subsequently instructed Ronny to step out of the vehicle and go to the rear of the car with Defendant Fuentes.

14. At this point, the officers had no reasonable suspicion or probable cause to believe Ronny had committed any crime.

15. Vecchio and Rodriquez began to search the interior of the vehicle.

16. Rodriquez asked Fuentes for Ronny's key fob so that they could search the locked glove compartment.

17. No contraband or illegal items were found inside the glove compartment.

18. While Vecchio searched the bag on the passenger seat, he made multiple comments about the amount of money inside, which belonged to Ronny and Bianca.

19. Rodriquez told Vecchio, "Yeah, leave that there."

20. Vecchio continued to look at the money and searched the bag, stating, "Just making sure nothing's rolled up in here."

21. After searching through Ronny's and Bianca's personal belongings and finding nothing, Defendant Vecchio returned Ronny's keys to him.

22. Ronny respectfully asked if he could pose a question to the Defendant Officers. He then began to ask why the officers disrespect certain groups of people and are rough with them instead of simply instructing them to move their vehicles.

23. Rodriguez explained to Ronny, "There's certain officers that have bad experiences with these types of cars," referring to the type of vehicle Ronny was driving.

24. Vecchio added that some stops are "wild," and "so we gotta come off aggressive to a certain extent."

25. Defendant Officers left the scene without initiating any charges or issuing a parking ticket.

26. Defendant Officers failed to provide a stop receipt as required by the Chicago Police Department rules.

27. On information and belief, Defendant Officers failed to generate an Investigatory Stop Report as required by CPD rules.

28. As a result of the foregoing, Ronny and Bianca were deprived of rights secured by the Fourth Amendment to the United States Constitution, as well as Illinois law.

## DEFENDANT OFFICERS' HISTORY OF MISCONDUCT

29. Since this incident, Defendants Vecchio, Fuentes, and Tohatan have been relieved of their police powers due to multiple investigations into serious allegations of police misconduct.

30. Since this incident, Defendant Rodriquez has been recommended for reassignment and to undergo behavioral intervention.

31. Defendants Officers already have extensive histories of sustained allegations of misconduct.

32. Defendant Officers were all members of the 1863 tactical team, which has been the subject of numerous investigations by the Civilian Office of Police Accountability ("COPA").

33. In December 2024, COPA sent a memorandum to the Chicago Police Department identifying patterns of concern involving Defendant Officers and the 1863 tactical team. These included "unprofessional and disrespectful conduct towards civilians, including the use of profanities, insults, and threats of force"; the use of pretextual traffic stops for reasons such as stopping too far away from the curb, stopping in a non-parking zone, and seatbelt violations"; and "a consistent failure to adhere to CPD policies regarding the documentation and recording of civilian/police encounters, including to complete ISRs and TSSS cards, failing to provide ISR receipts, and late BWC activations."

34. In October 2025, COPA issued separate memoranda to CPD regarding Vecchio and Rodriquez, recommending that Vecchio be relieved of his police powers pending the resolution of COPA's investigations, and requesting that the Chicago Police Department reevaluate

5

Rodriquez's assignment as an 18th District tactical team officer. COPA also recommended that Rodriquez be screened for entry into CPD's Behavioral Intervention System.

35. COPA also noted that Vecchio had the highest number of complaints – also known as log numbers – in the Chicago Police Department (76 log numbers), Rodriquez had the second-highest number of complaints (67 log numbers), Tohatan had the third-highest number of complaints (46 log numbers), and Fuentes had the fourth-highest number of complaints (43 log numbers).

36. The average Chicago Police Department member has 3.5 log numbers.

37. The majority of the complaints and investigations involve allegations of unjustified traffic stops, arrests, searches, and disrespectful or unprofessional conduct.

38. Additionally, COPA is investigating cases in which Vecchio allegedly provided false statements and/or testimony. Both incidents involved traffic stops during which Vecchio recovered a firearm during a vehicle search.

## LAWSUITS AGAINST DEFENDANT OFFICERS

39. Defendant Officers are no strangers to being accused of unlawful conduct similar to the conduct described in this complaint.

40. In *Wilson v. Vecchio* (24-cv-12371), Defendant Vecchio was accused of approaching the plaintiff's stopped car for a minor parking violation, unlawfully searching the plaintiff's vehicle, unlawfully detaining the plaintiff, using excessive force against the plaintiff, and denying the plaintiff equal protection.

41. The City settled *Wilson* for $80,000.

42. In *Northington v. Tohatan et al.* (24-cv-11466), Defendants Tohatan, Vecchio, and Fuentes were accused of approaching the plaintiffs' stopped car for a minor parking violation, pulling him out of his car, handcuffing and detaining him, searching his car, mocking, insulting, and threatening him before walking away and authoring a falsified stop report.

43. The City settled *Northington* for $80,000.

44. In *Ipaye v. City of Chicago et al.* (24-cv-8958), Defendants Vecchio, Rodriquez, and Tohatan were accused of searching the plaintiff's vehicle and person without consent or probable cause.

45. The City settled *Ipaye* for $80,000.

46. In *Haley v. Tohatan, et al.* (22-cv-1785), Defendant Tohatan was accused of unlawful search and seizure after he and another officer approached a stopped vehicle on West Erie Street on December 8, 2021.

47. The plaintiff in Haley alleged that Tohatan ordered him out of his car, handcuffed him, and searched his car despite there being no probable cause or reasonable suspicion of any criminal conduct.

48. The City settled *Haley* for $38,000.

49. In *Partee v. Hasan* (19-cv-3689), Defendant Tohatan and two other officers were accused of handcuffing the plaintiff and searching his car despite the fact that the plaintiff had done nothing illegal.

50. The City settled *Partee* for $40,000.

7

51. In *Farris v. City of Chicago et al.* (22-cv-1729), Defendants Tohatan and Fuentes were accused of excessive force, unlawful search, wrongful detention, and malicious prosecution after they approached a stopped vehicle.

52. The City settled *Farris* for $100,000.

53. In *Streeter v. Rodriquez et al.* (24-cv-04158), Defendant Rodriquez is accused of using excessive force during two encounters with the plaintiff, one during which he repeatedly and forcefully banged the plaintiff's face and head into his vehicle. Defendant Rodriquez and Defendant Donnelly are also accused of searching the plaintiff's vehicle and person without consent or probable cause during the second encounter.

54. The *Streeter* lawsuit remains pending.

55. In *Garcia v. Vecchio et al.* (25-cv-13109), Defendants Vecchio, Tohatan, and Fuentes are accused of unlawfully searching the plaintiff without reasonable suspicion or probable cause.

56. The *Garcia* lawsuit remains pending.

57. In *Quinn v. Vecchio et al.* (25-cv-10782), Defendants Vecchio and Rodriquez are accused of searching the plaintiff's vehicle without consent or probable cause leading to plaintiff's false arrest. Vecchio is accused of falsifying reports and offering perjured testimony regarding the stop.

58. The *Quinn* lawsuit remains pending.

59. The cases cited above are just the tip of the iceberg when it comes to lawsuits against Chicago police for unlawful stops and searches.

60. The city has paid millions of dollars in settlements of lawsuits alleging unlawful traffic and investigatory stops and illegal searches.

8

61. As just one example, the City's Law Department agreed to pay the family of Dexter Reed $1.25 million to settle their lawsuit arising from an illegal, pretextual stop of Reed by Chicago police which resulted in the death of Reed and the wounding of an officer.

### DEFENDANT RODRIQUEZ'S DISCIPLINARY HISTORY

62. Defendant Rodriquez has been disciplined for similar conduct in the past.

63. On February 1, 2024, the Chicago Police Department's Bureau of Internal Affairs ("BIA") sustained allegations against Defendant Rodriquez for verbal abuse/profanity and operation/personnel violations/neglect of duty during a traffic stop.

64. The BIA determined that Defendant Rodriquez verbally abused the reporting party by directing multiple profanities towards the reporting party and that he violated CPD Special Order S03-14: Body Worn Cameras by failing to record the entirety of the traffic stop.

65. The BIA recommended that Defendant Rodriquez receive a three-day suspension.

### DEFENDANT FUENTES' DISCIPLINARY HISTORY

66. Defendant Fuentes has been disciplined for similar conduct in the past.

67. On May 30, 2023, COPA sustained allegations against Defendant Fuentes and another officer of using profanity against a civilian at a traffic stop, unlawfully detaining the civilian, and unlawfully impounding the civilian's vehicle.

68. During the incident, Fuentes ordered the driver out of the car and handcuffed him, telling him his car would be towed. Fuentes yelled at the man, "Your $50,000 car is my car now! No, no, it's my car now! It's my car now! My car now! My car!"

69. Fuentes later claimed he searched the car because he smelled burnt cannabis. But the search yielded no narcotics or other contraband.

70. The officers issued the civilian a citation for parking in a tow zone, and ordered his car towed under a provision of the City of Chicago ordinances that authorized towing "[w]hen an unattended vehicle is parked illegally" in a marked tow zone.

71. The civilian was found "not liable" by the administrative law judge on his citation – presumably because his car was not unattended.

72. COPA recommended that Fuentes receive a 45-day suspension for his conduct.

73. The Chicago Police Department concurred with COPA's findings but felt Defendant Fuentes should receive only a 10-day suspension.

74. On January 16, 2024, COPA sustained allegations that Defendant Fuentes "made insulting, mocking and belittling statements" toward two civilians at a traffic stop, and that he arrested a civilian and impounded his vehicle as retaliation for the civilian looking at Fuentes' identification.

75. At several points during the stop, Fuentes told the civilians that they were "ignorant as fuck" and commented to a fellow officer that one of the civilians was a "jag," which Fuentes later admitted was shorthand for "jagoff."

76. When Fuentes observed the civilian looking at his star number and squad car, Fuentes said, "You are not going to size me up like that, looking at my star number and my vehicle number."

77. The COPA investigator noted in his report that "[d]espite Fuentes claiming in his interview that he felt [one of the civilians] was disrespectful and did not respect their authority, only Fuentes is captured acting in a disrespectful manner."

78. COPA recommended a 10-day suspension for Fuentes as a result of his conduct.

79. On January 23, 2024, COPA sustained allegations that Defendant Fuentes and another officer used profanity and racist language toward African-American civilians during a traffic stop.

80. During the traffic stop, Fuentes told another officer, "I'm tired of these fucking people acting like animals, dude," and referred to the civilians as "fucking animals."

81. Fuentes' conduct was captured on body-worn camera footage.

82. COPA recommended a suspension of up to 30 days for Fuentes.

83. On April 5, 2024, the Chicago Police Department concurred with COPA's findings and its recommended penalty of a 30-day suspension for Defendant Fuentes.

## DEFENDANT TOHATAN'S DISCPLINARY HISTORY

84. On November 27, 2018, COPA sustained allegations that Defendant Tohatan engaged in an unjustified verbal altercation with a civilian, illegally searched the civilian's car, and improperly issued a citation to the civilian for no proof of insurance despite the civilian offering to show him proof of insurance on his phone.

85. The incident began when Tohatan and another officer pulled the civilian over after doing a U-turn.

86. COPA recommended a 7-day suspension for Defendant Tohatan.

87. On August 25, 2020, COPA sustained an allegation that Defendant Tohatan engaged in verbal abuse.

88. Tohatan was suspended for 5 days as a result of his misconduct.

89. On December 20, 2022, COPA sustained allegations that Defendant Tohatan engaged in verbal abuse and profanity.

90. Defendant Tohatan was suspended for 5 days as a result of his misconduct.

91. On April 11, 2023, COPA sustained allegations that Defendant Tohatan engaged in an undisclosed civil rights violation.

92. Tohatan was reprimanded for his misconduct.

93. On December 14, 2023, COPA sustained allegations that Defendant Tohatan engaged in undisclosed misconduct during a traffic stop.

94. On an unknown date, COPA sustained allegations against Defendant Tohatan of Coercion Threat of Arrest/Charges Coerced Confession.

95. The discipline cited above is just the tip of the iceberg when it comes to discipline against Chicago police officer for unlawful stops and searches and verbal abuse of civilians.

## PRAYER FOR RELIEF

For the foregoing reasons, the Plaintiffs RONNY CARSON and BIANCA MURRAY, pray for judgment against Defendants in a fair and reasonable amount, including compensatory and punitive damages, attorney fees and costs, and for any additional relief this Court deems just and proper.

## JURY DEMAND

The Plaintiffs RONNY CARSON and BIANCA MURRAY, request a trial by jury.

**DATED:** November 3, 2025

Respectfully submitted,
RONNY CARSON and BIANCA MURRAY

/s/ Jordan Marsh
*Attorney for the Plaintiffs*

**LAW OFFICE OF JORDAN MARSH LLC**
33 North LaSalle Street Suite 2000
Chicago, IL 60602
(224) 220-9000
jordan@jmarshlaw.com